## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
**Urbana Division**

UNITED STATES OF AMERICA,

      Plaintiff,

v.

RICKEY SMITH,

      Defendant.

Case No. 24-30001

### REPORT & RECOMMENDATION

This case is before the Court on Defendant Rickey Smith's Motion to Suppress (#48). The Court held an initial Evidentiary Hearing on August 11, 2025. At that hearing, the Court heard argument and granted Defendant's oral motion to continue the Evidentiary Hearing. The Court directed the parties to file supplemental briefs on the issue of whether Defendant requested return of his cell phone while it was in police custody, as the parties disagreed on this fact. On August 25, 2025, Defendant filed a Motion to Admit (#58), which the Court granted, allowing an affidavit by W. Scott Hanken into evidence. In response, the government asked for a supplemental hearing. The Court held a Supplemental Hearing on December 15, 2025. Defendant requested time to further brief the issue. The Court gave Defendant until January 9, 2026, to file a supplemental brief, but no brief was filed. After considering the briefs and the evidence and arguments presented, the Court recommends that Defendant's Motion to Suppress (#48) be denied.

### I.    Background

At the initial Evidentiary Hearing, the parties admitted three videos and two exhibits into evidence and called two witnesses: Detective Jennifer Howard and Detective Colton Redding with the Springfield Police Department ("SPD"). Detectives Howard and Redding are the officers who questioned Defendant and who seized his phones.

Additional witnesses testified at the Supplemental Hearing: W. Scott Hanken and Mary Rodgers.

### a. Facts Relating to Detention

On September 2, 2023, the SPD responded to the Hampton Inn and Suites in Springfield, Illinois at approximately 12:22 p.m. for a report by a seventeen-year-old female, "MV," that she had been battered by a forty-three-year-old male, later identified as convicted sex offender Rickey Smith.

Detectives interviewed MV, during which she explained that she had been staying with Defendant for a little more than a week in a hotel in Bloomington, Illinois, or in his vehicle in Springfield. On September 1, 2023, MV and Defendant picked up a friend of MV, Minor 1 ("M1"), who was thirteen years old. According to MV, Defendant dropped both minors off at the mall and picked them back up around 9:00 p.m. M1 was able to leave eventually after calling her grandmother.

According to MV, later in the evening, Defendant became upset about M1 calling her grandmother. MV stated Defendant struck her and pulled her hair. The two then drove to the Hampton Inn at approximately 1:15 a.m. on September 2, 2023. MV stated Defendant then demanded that MV perform oral sex on him. MV told officers while she was performing oral sex on Defendant, she saw a flashlight above her head and noticed Defendant was recording her with his cell phone.

MV stated that Defendant pushed her onto the bed and engaged in vaginal sex with her. During the interview she pointed to the side table in the hotel room and told officers Defendant had placed his cell phone on the table and recorded himself vaginally penetrating her. MV relayed to the officers that Defendant had not used a condom. She further noted that she attempted to push Defendant off her and she was crying during the incident.

At approximately 3:26 p.m., officers encountered Defendant in the hotel lobby and placed him in handcuffs to be taken to the police station for questioning. At the time of the arrest, they located and seized two cell phones, one a purple iPhone in a grey case ("grey phone"), the other a black iPhone ("black phone").

### b. Facts Relating to Consent

Defendant was transported to the Springfield Police Station for an interview. Defendant's interview, along with his telephone calls while alone in the interview room, were both audio and video recorded. The following facts are taken mostly from this uncontradicted recording.

While waiting in the interview room, at approximately 5:01 p.m., Defendant requested to use a phone to call someone to pick up his daughter and his son. At approximately, 5:04 p.m., Defendant was told that the detectives had his phones, and he was provided a cell phone.

Defendant placed a call at approximately 5:05 p.m. During this phone call, Defendant asked the person to call his phone, noting that law enforcement had taken his phones. Then, he stated, "I need you to do something for me." For the next several minutes he attempted to explain to that person how to lock his phone remotely. In between requesting that she Google how to do so "because [he] can't see it," he continually pleaded with her to hurry. At approximately 5:14 p.m. he told her to hurry and stated that the phone contained "everything."

After approximately six minutes of pleading with this person to use the Find My iPhone feature to lock his phone and asking if she had been able to locate it, Defendant called an individual he addressed as "Christian." Defendant began this call by stating, "Christian, it's your dad. I need you to do something for me. Can you, can you go to find my iPhone and lock, lock my iPhone? Please." He then stated, "Christian, I really need you to lock my phone." Shortly, thereafter he stated, "Christian, I, listen, they got my phone, I need my phone locked." At approximately, 5:23 p.m. he provided his iCloud account and password and asked his son if that had worked. When he apparently was told that it had not worked, he provided another password. When that failed, he again provided a further password. When these three passwords failed, he asked that his son attempt to reset his password remotely. He then provided the phone number for the device, 217-331-3227.

At 5:27 p.m. Detectives Howard and Redding entered the interview room to speak with Defendant, carrying Defendant's two cell phones. Defendant lied to them and claimed that he was talking to his son to locate his uncle. He then stated he was attempting to locate the number for his daughter and stated it would be in his phone. Detective Howard explained that she would be willing to get the number from his phone, but that she would not return the phones to him. He once again asked the Detective to access the black phone to get his daughter's phone number, but when he saw that the phone was locked, he became frustrated and claimed he did not know the passcode because, "that's [his] son's phone. I don't have her number in that phone that's my phone there (pointing to the other phone), that's [his] son's (pointing to the black phone again) but [Defendant] had it because he got in trouble." He then reiterated he did not know how to access the black phone and had taken it from his son the night before. While speaking about the phones, however, Defendant had remained on the call with his son. Defendant finally ended his call at approximately 5:30 p.m. by telling his son to see if he can find "Kaleese" and to find out what "Aunt Bull" is going to do. Shortly thereafter, Detective Howard read Defendant the *Miranda* warnings, and Defendant agreed to speak with the detectives, stating "I can talk until I don't want to talk."

Within two minutes of waiving his *Miranda* warnings, Defendant acknowledged that he knew MV was seventeen years old. He then stated that the minimum age of consent in Illinois was seventeen. At approximately 5:35 p.m. Defendant admitted that he and MV had sex at the Hampton Inn. At 5:45 p.m. he again acknowledged he engaged in oral and vaginal sex with MV. He denied, however, that he had held her down, that she had been crying, or that she had been pushing him. When asked if he had recorded it, he initially stated he had, and that it would be on the grey phone. When asked to confirm what was on his grey phone, he stated it was just a conversation between Defendant and MV regarding sex, but not the sex act itself.

Over the next approximately twenty minutes Defendant was asked multiple times if he recorded the sex acts with MV. Detective Howard explained that they wanted to know if there was a video on his phone to determine whose story was the truth regarding

the sexual assault allegations that MV made against Defendant. Defendant responded by stating he believed he was under arrest, to which Detective Howard responded that he was not. She reiterated this multiple times throughout the interview, although she also made clear that he was not free to leave.

At approximately 5:52 p.m., in response to Detective Howard's question of whether he recorded the sex acts, Defendant placed his head in his hands and upon looking up pointed to the black phone he had claimed belonged to his son, stating "I mean I can show you on the phone, hand, hand me the black phone." He then guaranteed that he could access the black phone. Detective Howard requested his password and explained that she would not just give him the phone to ensure that he could not delete something he did not want them to see. Defendant responded by stating he did not know how to get into the phone but could take some guesses.

After consenting to a buccal swab a few minutes later, Defendant asked whether he was under arrest. Detective Howard again responded that he was not. At 6:06 p.m., Defendant asked, "Where do we go from here?" When he again refused to answer whether he had recorded the sexual contact with MV, the detectives got up to leave. He then asked Detective Howard why she was holding his phone. Detective Howard responded that he claimed he was not certain whether there was a video on his phones and the victim was claiming there was.

At this point in the evening, Defendant stated there was a video on the grey phone, which he claimed as his own, and that there was a video on the black phone that he believed he could get into, but that phone belonged to his son. Detectives explained that they needed to know if a video regarding the sexual abuse allegations existed, and they could potentially give back the phones once they could determine whether either phone held videos of the encounter. The detectives left the interview room at 6:08 p.m.

Approximately one minute after Detective Howard and Redding left the interview room, Defendant knocked on the interview door and asked the responding officer, "Can you get the detective for me, the lady?" At 6:28 p.m. Detective Howard returned, and she

and Defendant moved to a second interview room for the purpose of continuing the conversation.

At 7:11 p.m. Detectives Howard and Redding reengaged Defendant based upon his request. Detective Howard first noted that Defendant had asked them back to continue speaking, to which Defendant responded by asking, "So what's going on now?" Detective Howard answered that she was hopeful Defendant would continue speaking with her regarding what had happened, regarding the phones, and regarding the seventeen-year-old. At 7:13 p.m. Detective Howard once again asked him if he had taken a video of the sex acts. Defendant responded, "If I did what does that do? . . . If there's a video of me and [MV] having sex what does that do for me? Like what is that? What could that possibly do for me?" The detectives then asked about his interaction with M1. Subsequent to explaining his contact with M1, detectives asked him about what phone numbers he used. He stated that he had a phone number that ended in 3227, but claimed it belonged to the phone he had taken from his son, and stated, "But that's not my phone that's my son's phone, I just took it from him."

At approximately 7:18 p.m., Detective Redding once again explained to Defendant that if there was a video of the sexual conduct it was possible that it could prove or disprove the claims that MV had made against Defendant. He explained that they could seek a search warrant for Defendant's devices and wanted to be able to make that determination today as opposed to days later. Detective Howard then explained that it may take time to obtain the search warrant because of the upcoming holiday the following Monday. At 7:20 p.m., Detective Redding once more asked if there was a video of the sexual acts with MV. Defendant responded, "Here give me the phone, the phone, where's the phone?" Detective Howard then explained that it was in a secure locker, to which Defendant replied, "Ok bring me the phone."

Once again Detective Howard told Defendant that she was not just going to hand over the phone to him. Defendant stated, "I'm saying, you saying you need to see the video, I— I can get the phone unlocked." Detective Howard reaffirmed that if she brought the phone that she was not going to allow Defendant to handle it because she did not

want him to try to erase the video. She stated that all she wanted to know was whether the video of Defendant and MV committing a sex act was on the device. Defendant responded, "Go get the phone, I'll show you." When Detective Howard commented that he previously stated he did not know how to get in the phone, Defendant replied, "Get the phone, I'll show you, I'm pretty sure."

Detective Howard then asked for the combination to unlock the phone. Defendant provided different combinations that he believed would unlock the phone. At approximately 7:24 p.m. Detective Howard left to retrieve Defendant's phone. At 7:26 p.m. Detective Howard returned to the interview room with both phones, and asked, "The black one?" and Defendant responded "Yeah, just put the code in 122661."

When the phone was unlocked at the direction of Defendant, he told the detectives to "push the close on there," referring to a pop-up asking to reset his Apple ID passcode. Defendant then acted like he had no idea why that would be there and commented, "I didn't— I don't need to reset my passcode. . . . I think that would be him trying to reset the passcode, but I don't need to reset." Detective Howard then asked, "Why is he trying to reset it?" and Defendant replied, "shit I don't know." Defendant then told the detectives to click "don't allow." Detective Howard's response, to preserve evidence, including the video Defendant stated was located on the device, was to stop manipulating the phone. Detective Redding then reaffirmed that Defendant was requesting that the detectives click "don't allow" to which Defendant responded "Yes." Detective Howard recommended that they not mess with it because clearly someone was "trying to find their phone and all kinds of shit." Defendant's response was very clear, "I'm telling you, you can get in the phone, and do, and look to view this video." The following exchange then took place:

| | |
|---|---|
| Detective Howard: | So there is a video on there? |
| Defendant: | Yeah. |
| Detective Howard: | You know for sure there is a video on there? |
| Defendant: | Yep. |
| Detective Howard: | Cuz you took it? |
| Defendant: | Yep. |
| Detective Howard: | Did she know you took it? |

| | |
|---|---|
| Defendant: | Yep. |
| Detective Howard: | What is she doing in the video? |
| Defendant: | Having— having sex. |
| Detective Howard: | You guys having sex? Like vaginal sex? |
| Defendant: | Yeah. |
| Detective Howard: | Oral sex? |
| Defendant: | Yep. |
| Detective Howard: | All sex? |
| Defendant: | We just having sex. You can get in the phone and watch the video. |
| Detective Howard: | You took it last night? |
| Defendant: | Yeah. |

Detective Howard left the room and stated she was not dealing with the phone because "someone was trying to get into it." Defendant responded, "I'm telling you," in what appears to be a reference to the video being on the device and their ability to search it. At approximately 7:31 p.m. the detectives left the interview room with the black phone.

At approximately 7:38 p.m. Detective Howard reentered the room and told Defendant that he would be arrested for child pornography crimes and was provided tickets for driving while suspended. Defendant then asked what class felony the charges were. He then asked about his impounded vehicle's return. While being escorted out of the interview room at 8:42 p.m. he asked if Detective Howard could get the numbers for his children from his cellular phone. Detective Howard asked whose numbers he wanted, and she proceeded to her office where his device had been secured and retrieved the black phone to provide him with telephone numbers.

She then opened it again and reiterated that because of the reset question upon opening it, she did not want to mess with the phone and that it needed to be in the same state it was when it was seized. Defendant then stated, "But I'm giving you permission to do it, and then I'll just give you the password." Detective Howard then repeated that she did not want to change anything on the device for when she got a search warrant and that it needed to be in the same state as when she got it. She stated that it was clear someone was trying to find this phone and reset the passcode. When Defendant stated that he needed some of the numbers out of it, Detective Howard responded, "If you

wouldn't have been calling folks telling them to reset your shit, this wouldn't have happened." Defendant responded, "I didn't tell anyone to reset." After attempting to look at the phone to find phone numbers for him, Detective Howard explained that if the black cell phone was not showing the warning that she would get into the phone for him, but that she did not want to do anything she was not supposed to do that would change data. At the conclusion of the interview, Defendant was taken to the Sangamon County Jail, and the detectives kept possession of both phones. Defendant was released on bond from Sangamon County Jail on September 6, 2023.

Detective Timothy Zajicek of the SPD, who also serves as a Task Force Officer ("TFO") for the United States Secret Service ("USSS"), ultimately obtained a warrant to search both cellular devices on October 10, 2023. After conducting a search of the devices, Detective Zajicek located three videos of Defendant engaged in sex acts with MV. The videos were located on the same device, the black cellular phone, that Defendant admitted he had used to film the sex between MV and himself.

### c.  Facts Relating to Delay in Obtaining Warrant

Apart from serving as a detective with the SPD with a caseload of his own between September 2, 2023 and October 10, 2023, as well as a TFO with USSS assigned to assist and conduct investigations across the Central and Southern Districts of Illinois, Detective Zajicek was, and continues to be, a forensic examiner for the SPD and performed telephone extractions, cellular device mapping and reviews, and other technological assistance for the department and other agencies as needed. He also was required to perform multiple hours of overtime shifts outside of his other mandated duties.

Detective Zajicek began drafting the warrant on September 11, 2023, while working on a death investigation that began on September 6, 2023, conducting phone extractions for the death investigation and an Alcohol, Tobacco, and Firearms ("ATF") case assignment, performing overtime, and conducting an interview for a fraud matter, which took place on September 7, 2023. He completed his first draft for review by the U.S. Attorney's Office on September 18, 2023. On that same date he was required to assist with security video for a homicide investigation.

Between September 19 and 22, he spent most of his time reviewing, mapping, and performing analysis on cellular data records for an SPD investigation. He also continued working as the lead detective on a shooting investigation that required a cell phone extraction and report writing. On September 22, 2023, he performed cellular data records review for a homicide investigation.

Between September 25 and October 6, 2023, Detective Zajicek assisted with a homicide investigation performing his duties as a forensic examiner and worked as the lead detective on a stalking investigation. On September 27, 2023, he was assigned to conduct a cell phone extraction for a homicide investigation. To further complicate Detective Zajicek's already busy schedule, he was also required to assist on a firearms investigation in which he had to perform cell phone extractions for three devices between September 28, 2023, and October 11, 2023. On both October 3 and October 5, 2023, he was required to conduct follow-up interviews for the USSS investigation and perform a cell phone extraction for an SPD shooting investigation. Between October 5 and October 26, 2023, he was required to assist with a fraud investigation, once again conducting cell phone extractions. Between assisting and conducting his primary duties he continued to edit the draft of the warrant for Defendant's phones, which was sworn out on October 10, 2023.

On December 6, 2023, a federal complaint (#1) charging Defendant with multiple types of child pornography crimes, including production of child pornography, was filed. Defendant was arrested the next day. Text Order 12/07/2023. On January 3, 2024, a grand jury sitting in the Central District of Illinois returned an Indictment (#9) against Defendant charging him with violations of 18 U.S.C. § 2251(a), sexual exploitation of a child; 18 U.S.C. § 2252A(a)(5)(B), possession of child pornography; and 18 U.S.C. § 2260A, penalties for registered sex offenders. (#9) Defendant has remained detained since his arrest.

On April 16, 2025, Defendant filed the instant Motion to Suppress, claiming that the search of his devices was unconstitutional and that the fruits of the search should be suppressed. As part of his Motion, Defendant claims that Detectives Howard and

Redding conducted a warrantless search of his devices, and that the warrantless seizure for over a month prior to obtaining a warrant was unreasonable. (#48 at 4.)

At the conclusion of the initial Evidentiary Hearing, the Court determined that additional evidence was needed on the issue of whether Defendant requested his cell phone be returned while it was in police custody. After the Hearing, Defendant submitted an affidavit from Defendant's state court attorney, W. Scott Hanken. Mr. Hankens' affidavit stated that "Mr. Smith requested that Affiant make inquiries and attempts to recover 2 cellular phones which were seized by law enforcement and ostensibly being held as evidence." Mr. Hanken stated that he "placed a call regarding same to First Assistant State's Attorney ("FASA"), Mary Beth Rodgers to inquire about obtaining an evidence release." Mr. Hanken stated that after making the request, he "was unable to secure an agreement regarding the return of the cellular phones at issue." He further explained that "to the best of Affiant's recollection, no specific reason was given other than the Statute of Limitations for the filing of formal charges had not and would not toll for some time." Hanken Affidavit, #58 at 4.

The government filed a Response (#59) to the Affidavit. The government spoke with FASA Rodgers, who "confirmed that no documentation regarding the return of the defendant's cellular phones exists." Furthermore, "[w]hen asked about the phone call with Attorney Hanken, FASA Rodgers stated she did not have a specific memory of the call. FASA Rodgers also confirmed that she checked her email correspondence and cell phone calls from this same time frame and did not locate a call or email with Attorney Hanken."[1] The government asked for a Supplemental Hearing to allow Rodgers to "explain the procedure in Sangamon County necessary to request or obtain items seized during an investigation."

At the Supplemental Hearing, Mr. Hanken and FASA Rodgers testified. FASA Rodgers testified that she had no record of any phone calls or emails received from Mr.

---

[1] The government's statements about conversations with FASA Rodgers are not evidence. FASA Rodgers testified in the supplemental proceeding, and the Court will rely on her testimony alone rather than the government's representation of what it anticipated that testimony would be. *See United States v. Dixon*, 137 F.4th 592, 605-06 (7th Cir. 2025).

Hanken regarding Defendant's case. FASA Rodgers explained the process for a person to obtain seized property. Specifically, the office has a form for an individual to fill out to seek return of their personal property from police custody. FASA Rodgers testified that there was no record of a form submitted for Smith's phones. FASA Rodgers testified that the office normally requires a formal form to be submitted before they will release evidence. Last, FASA Rodgers said that if Mr. Hanken had made an informal request for return of the phones, that she would have referred him to the form or the assistant assigned to the case.[2]

Mr. Hanken testified that he first met with Defendant on September 14, 2023, about possible representation. On a later date, Defendant stopped by Mr. Hanken's office to ask Mr. Hanken to inquire about return of his personal property, including his phone. During that meeting, Mr. Hanken placed a call to the State's Attorney's Office and recalled speaking with FASA Rodgers. During the call, Mr. Hanken noted that because the State had not charged Defendant, Defendant was requesting the return of his personal property.[3] Mr. Hanken recalled FASA Rodgers stating that she was not in the position to return the personal property at that time.

Upon questioning, Mr. Hanken did not recall the date of the phone call but only knew that it occurred sometime in October when they were notified the State was not filing a complaint against Smith. Mr. Hanken was confident that the phone call requesting the return of property took place after he discovered the State's decision to not file charges.[4] Mr. Hanken was aware of the form required by the State's Attorney's Office and admitted that he did not submit the form in this case. He testified that his normal procedure was to make an informal request and if the State's Attorney did not informally agree to return the property, he would not submit the form.

---

[2] FASA Rodgers acknowledged that Mr. Hankin had called in her in other cases asking for property to be returned. She recalled at least one in which she orally declined to return a person's property without requiring Mr. Hankin or his client to formally request return using the form.

[3] Defendant was given notice that he was not being charged by the State.

[4] It's unclear from the evidence the precise date of the purported call. Mr. Hankin testified in his affidavit that it was "on or about the first week of October." The government lawyer also asked a question referencing October 5, which would have been the no-charge date, but no testimony confirmed that date.

## II.     Analysis

As a preliminary matter, it is not clear that Defendant Smith has standing to challenge the government's search of the black phone. Neither party raises this issue, as they assume Smith had a Fourth Amendment right to privacy in the black cell phone. Normally, the government's failure to raise an argument would forfeit it, but this is one area in which the Seventh Circuit has previously found to be an exceptional case worthy of forgiving the forfeited ground. *See United States v. Edwards*, 34 F.4th 570, 583-84 (7th Cir. 2022). This might be such a case where the Court has "all the findings of fact necessary … and that purely legal conclusion jumps off the page." *Id.* (*citing United States v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022).

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. Amend. IV. This protects a defendant from unreasonable searches in places where the defendant has a legitimate expectation of privacy. *Edwards*, 34 F.4th at 583.

Fourth Amendment rights are personal. They may not be asserted vicariously, on behalf of others. *United States v. Carlisle*, 614 F.3d 750, 756 (7th Cir. 2010) (citing *Rakas v. Illinois*, 439 U.S. 128, 134 (1978)). An accused defendant seeking to suppress evidence obtained from an allegedly unconstitutional search bears the burden of establishing that the search violated his <u>own</u> Fourth Amendment rights. *Id.* at 758 (citing *United States v. Salvucci*, 448 U.S. 83, 95 (1980)). A defendant has standing to challenge a search only if he has a "legitimate expectation of privacy" in the searched area. *Carlisle*, 614 F.3d at 758. "A legitimate expectation of privacy exists when the defendant exhibits a subjective expectation of privacy and the expectation is one that society is prepared to recognize as reasonable." *United States v. Pitts*, 322 F.3d 449, 456 (7th Cir. 2003).

Only Defendant Smith's failure to exhibit a personal expectation of privacy in the black phone is at issue here. As explained by the Seventh Circuit in *United States v. Dixon*, because the defendant bears the burden of establishing his standing to challenge the search, he needs to come forward with some evidence that he had a subjective expectation

of privacy in the searched location. *Dixon*, 137 F.4th 592, 601-02 (7th Cir. 2025) (*citing United States v. Mendoza*, 438 F.3d 792, 795 (7th Cir. 2006) (affirming denial of motion to suppress where defendant failed to produce any evidence of a privacy interest); *United States v. Meyer*, 157 F.3d 1067, 1080 (7th Cir. 1998) (same); *United States v. Ruth*, 65 F.3d 599, 605 (7th Cir. 1995) (same)). The Court considers a variety of factors, including, among others, whether the person exhibited a subjective expectation in the place searched and took normal precautions to protect his privacy in that place. *See United States v. Duprey*, 895 F.2d 303, 309 (7th Cir. 1989).

The evidence in this case suggests quite the opposite. Although Smith was found in possession of the black phone and later admitted to using it to video his encounter with the minor victim, at no time did Smith ever claim ownership or express any expectation of privacy in the phone. To the contrary, Smith repeatedly denied ownership of the phone, claiming multiple times that the phone belonged to his son and that he was unaware how to access it.

Even if we assume the black phone belonged to Smith (he obviously possessed it at the time of his arrest and admitted to using it), the Fourth Amendment does not apply to abandoned property. *United States v. Pitts*, 322 F.3d 449, 455–56 (7th Cir. 2003) ("[N]o person can have a reasonable expectation of privacy in an item that he has abandoned.") (*quoting United States v. Basinski*, 226 F.3d 829, 836 (7th Cir. 2000)). Abandonment turns upon an objective test of "the external manifestations of the defendant's intent as judged by a reasonable person possessing the same knowledge available to the government agents involved in the search." *Id.* (*citing Basinski*, 226 F.3d at 836). A defendant may relinquish his interest in the property by disassociating himself from the property, thereby abandoning any legitimate (expressed or otherwise) expectation of privacy. *See Bond v. United States*, 77 F.3d 1009, 1013 (7th Cir. 1996).

Again, Defendant repeatedly denied ownership of the phone. Indeed, his only suggestion of ownership was the admission that he used it and that he would show the officers a video on it. He never expressed any expectation of privacy in the phone that he claimed belonged to his son.

Since neither party addressed the issue, the Court will not engage in a full analysis of this question and will not rely on this alone for its recommendation. Nevertheless, the Court believes Defendant exhibited no subjective expectation of privacy in the black phone and this would be sufficient to deny the Motion.

### a. Consent

The first issue raised by the parties is whether Defendant consented to the seizure and later search of his phone. Defendant broadly argues that the warrantless seizure and subsequent search of his phone was inappropriate. The government counters that Defendant consented to the subsequent search.

Defendant does not specify the reason he believes the original seizure of the phone was unconstitutional. Both phones were seized by officers at the time Defendant was placed in handcuffs and transported to the station for questioning. At that time, the minor victim had told the officers that she was under 18, that she had a sexual encounter with Defendant, and that Defendant had recorded the encounter with his phone. When officers confronted Defendant, they were aware that he had a history of sexual misconduct and he possessed two phones. At this moment, officers were authorized to seize and secure the cell phones to prevent destruction of possible evidence while seeking a warrant.[5] *See Riley v. California*, 573 U.S. 373, 388 (2014); *Illinois v. McArthur*, 531 U.S. 326, 331-333 (2001). Once the physical phone was lawfully in possession of law enforcement, the officers were required to obtain a warrant to search its content unless an exception existed. *Riley*, 573 U.S. at 401-403.

One of those exceptions exists here because the facts presented demonstrate Defendant consented to the officers searching the black phone.[6] "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant

---

[5] This proved prophetic given Defendant's efforts to both lock and erase the phone. As the government argues, the officers' discovery of Defendant's attempt to obstruct the investigation further justified the continued seizure of the phone to protect the evidence.

[6] There is no dispute that the officers seized the two phones in Defendant's possession. Only the black phone is at issue in this motion to suppress as it contains the alleged videos. When the Court references "the phone" it is in reference to the black phone.

issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamante*, 412 U.S. 218, 219 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). "It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Id.* (citing *Davis v. United States*, 328 U.S. 582, 593-94 (1946)). "Consent lifts the warrant requirement of the fourth amendment but only if the consent to search is voluntary." *United States v. Quinones–Sandoval*, 943 F.2d 771, 774 (7th Cir. 1991). "[T]he question whether a consent to search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Bustamonte*, 412 U.S. at 227.

Initially during the interview, when asked about recording the sex acts, Defendant said, "I mean I can show you on the phone, hand, hand me the black phone." Later in the conversation when discussing whether there was a video on the phone, Defendant similarly stated, "Here give me the phone, the phone, where's the phone?" Detective Howard then explained that it was in a secure locker, to which Defendant replied, "Ok bring me the phone." Detective Howard explained that she was not just going to hand over the phone to Defendant, to which Defendant responded, "I'm saying, you saying you need to see the video, I— I can get the phone unlocked." Most explicitly, Defendant said, "We just having sex. You can get in the phone and watch the video."

When the detectives informed Defendant that he would be arrested for child pornography, Defendant asked about his impounded vehicle's return and if Detective Howard could get the numbers for his children from his phone. Detective Howard refused to retrieve the numbers because she wanted to leave the phone in the same state it was in when seized.

*United States v. Thurman*, 889 F.3d 356 (7th Cir. 2018), is instructive in this case. In *Thurman*, the Seventh Circuit emphasized that the scope of consent to search is determined by the totality of the circumstances and assessed under an objective reasonableness standard, with the burden on the defendant to limit consent if he chooses

to do so. The court found that Thurman's conduct demonstrated broad, unrestricted consent where he verbally agreed to the search of his phone, affirmatively directed agents to specific incriminating information, and imposed no limitations on the search despite declining to sign a written consent form. His active cooperation and failure to restrict the examination or request return of the phone indicated no intent to limit the scope of consent. Given the clear investigative purpose of the search, the court concluded that a reasonable person would understand the consent to include a forensic examination capable of uncovering relevant evidence, and therefore the search did not violate the Fourth Amendment.

As in *Thurman*, the scope of consent here is assessed under an objective reasonableness standard based on the totality of the circumstances. After discussing the videos with detectives for approximately two hours, Defendant asked officers to bring him his phone so that he could unlock it and allow them to view the videos. He then provided the passcode, affirmatively facilitating access to the device and the specific evidence under investigation. Defendant imposed no limitations on the search and did not attempt to restrict officers' access to the videos. At one point, he quite frankly said, "We just having sex. <u>You can get in the phone and watch the video.</u>" Under these circumstances, a reasonable person would understand Defendant's provision of the passcode and encouragement to open the phone as consent to search the phone for the videos at issue, consistent with *Thurman*'s conclusion that active cooperation and failure to limit consent support a finding of broad consent. Indeed, had Defendant not directed his son to reset the phone remotely, officers would have viewed the videos during the interview with Defendant present. Defendant never revoked this consent, nor did he limit its scope or inquire about his phone upon the conclusion of the interview.[7] Given Defendant's insistence that the officers view the videos, there is little question that he voluntarily consented to the later forensic examination that uncovered those same videos. *See Thurman*, 889 F.3d at 368.

---

[7] He did, however, inquire about his seized vehicle.

For these reasons, the Court finds Defendant consented to the seizure of his phone and permitted the officers to keep the phone to search for the videos.

### b. Reasonableness of Delay

Even if the Court concluded that Defendant had not consented to the seizure of his phones or that he revoked that consent by asking for their return, the Court finds the warrant valid because the delay between the lawful seizure of the phone and the warrant was not unreasonable when balancing the interests at play.

"Even a permissible warrantless seizure, such as the initial seizure here, must comply with the Fourth Amendment's reasonableness requirement. Thus, the Supreme Court has held that after seizing an item, police must obtain a search warrant within a reasonable period of time." *United States v. Burgard*, 675 F.3d 1029, 1032 (7th Cir. 2012). "When officers fail to seek a search warrant, at some point the delay becomes unreasonable and is actionable under the Fourth Amendment." *Id*.

"There is unfortunately no bright line past which a delay becomes unreasonable. Instead, the Supreme Court has dictated that courts must assess the reasonableness of a seizure by weighing 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Id*. at 1033 (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)).

Courts have considered the following factors when determining if a delay is unreasonable: the length of time the defendant was deprived of his property, any diminished interest in the property the defendant may have, the strength of the government's basis for the seizure, and the diligence of the police in pursuing their investigation. *Id*; *see also United States v. Smith*, 967 F.3d 198 (2d Cir. 2020).

First, the Court considers the length of time for which Defendant was deprived of his phone. Related to this factor is the diligence of the police in conducting their investigation. The parties agree that the police kept Defendant's phone for 38 days before obtaining a warrant. A delay of a month is significant and in some cases is unreasonable. *See Smith*, 967 F.3d at 207 ("[I]t is reasonable to expect that they will not ordinarily delay a month or more before seeking a search warrant.") At the same time, some circumstances

18

can justify an otherwise unreasonably long delay. *United States v. Vallimont*, 378 Fed. Appx. 972, 976 (11th Cir. 2010) ("[U]nder the reasonableness standard, certain circumstances might justify a delay that would otherwise be too long. For example, a delay could be justified if the assistance of another law enforcement officer had been sought, or if some overriding circumstances arose, necessitating the diversion of law enforcement personnel to another case. We also recognized that there may be occasions where the resources of law enforcement are simply overwhelmed by the nature of a particular investigation, so that a delay that might otherwise be unduly long would be regarded as reasonable.").

The delay in this case was not caused by the officer abandoning his duty. As he explained, Detective Zajicek was involved with multiple other investigations at the time Defendant's phone was seized. Detective Zajicek began drafting the warrant on September 11, 2023. Just five days before, Detective Zajicek was assigned to a death investigation which took a significant amount of his resources. In addition to the death case, Detective Zajicek was working on an ATF investigation, a stalking investigation, a firearms investigation, and a fraud investigation.

Importantly, Detective Zajicek did not completely abdicate his work on the warrant. He began drafting it on September 11 and completed his draft for the U.S. Attorney's Office on September 18th. He continued to edit and revise his warrant application until submitting it on October 10th. Detective Zajicek's delay was reasonable based upon the significant number of tasks he was required to complete during this timeframe, and the time required to familiarize himself with the evidence necessary to write the warrant. *See Burgard*, 675 F.3d at 1034 ("[The officer] may theoretically have been able to work more quickly, but his delay was not the result of complete abdication of his work or failure to 'see any urgency.'").

The length of the delay is also overshadowed in this case by the strength of the government's basis for the seizure. On multiple occasions, Defendant admitted that the phone contained videos relevant to the investigation. Defendant first stated he recorded the sex act. Then, he shifted and said that while there was a video between Defendant

19

and MV regarding sex, it did not include the sex act itself. When later asked again if the phone contained videos of the sex act, Defendant put his head in his hands and said, "I mean I can show you on the phone, hand, hand me the black phone."

Much later in the interview, Detective Howard once again asked him if he had taken a video of the sex acts. Defendant responded, "If I did what does that do? . . . If there's a video of me and [MV] having sex what does that do for me? Like what is that? What could that possibly do for me?" The detectives continued to discuss with Defendant about how to obtain access to the phone. This led Defendant to say: "I'm telling you, you can get in the phone, and do, and look to view this video." All of this demonstrates the strong likelihood that a video of the alleged sex act was on the seized phone. But the strength of the evidence is most highly demonstrated by this exchange between Detective Howard and Defendant:

| Detective Howard: | So there is a video on there? |
|---|---|
| Defendant: | Yeah. |
| Detective Howard: | You know for sure there is a video on there? |
| Defendant: | Yep. |
| Detective Howard: | Cuz you took it? |
| Defendant: | Yep. |
| Detective Howard: | Did she know you took it? |
| Defendant: | Yep. |
| Detective Howard: | What is she doing in the video? |
| Defendant: | Having— having sex. |
| Detective Howard: | You guys having sex? Like vaginal sex? |
| Defendant: | Yeah. |
| Detective Howard: | Oral sex? |
| Defendant: | Yep. |
| Detective Howard: | All sex? |
| Defendant: | We just having sex. You can get in the phone and watch the video. |
| Detective Howard: | You took it last night? |
| Defendant: | Yeah. |

In this exchange, Defendant admitted the phone contained a video from the prior night, admits he took the video, and admitted the video is of both vaginal and oral sex. Defendant's admission that the phone contained videos of his crime results in a

substantial government interest in seizing the phone. The government's interest in seizing the phone is further demonstrated by Defendant's attempts to lock down and/or erase the phone remotely. The officers knew that returning the phone would likely result in the destruction of relevant and significant evidence. This factor weighs heavily in favor of finding the delay reasonable.

Finally, the Court considers any diminished interest in the property Defendant may have had in the phone. "[I]t can be revealing to see whether the person from whom the item was taken ever asserted a possessory claim to it—perhaps by checking on the status of the seizure or looking for assurances that the item would be returned. If so, this would be some evidence (helpful, though not essential) that the seizure in fact affected her possessory interests." *Burgard*, 675 F.3d at 1033.

In this case, it is important to recall that Defendant denied any ownership interest in the phone. He specifically claimed the phone belonged to his son and that he could not access the phone. Throughout the 38-day delay, Defendant made one informal request for his phone through his attorney. However, as discussed above, Defendant fell short of filling out the form required for the return of property and never pursued the matter further after his lawyer's single phone call.[8] And this one attempt came after Defendant was made aware that the State was not charging him. He only sought the return of his phone when he thought the case was terminated.

Defendant's interest in the property also is substantially diminished by its known contents. Defendant admitted that videos existed on the phone of him and a minor engaged in sexual activity. This is contraband, and Defendant has no right to have those videos returned to him, so the request for its return was pointless. While this does not obviate the warrant requirement, it diminishes his interest in the property and factors in

---

[8] One could argue that Defendant's informal request for the return of his phone constituted the revocation of his consent to seize the phone. Even if Defendant did revoke his consent at this time, the strength of the government's interest in seizing the phone warrants continued possession of the phone. Likewise, if this did constitute a revocation of consent, the total delay is approximately one week, substantially shorter than the 38 days assessed herein. The evidence suggests that call happened the first week of October, and the warrant was issued October 10.

assessing the reasonableness of the delay. *See United States v. Jeffers*, 342 U.S. 48, 53-54 (1951).

Considering the interests at stake, the Court finds that while the delay was not insignificant, it was reasonable due to the strength of the government's interest in the phone, Defendant's demonstrated intentions to erase the phone, Detective Zajicek's extensive case load, and Defendant's limited interest in the phone.

### III.    Conclusion

For these reasons, the Court recommends that Defendant's Motion to Suppress (#48) be denied.

The parties are advised that any objection to this recommendation must be filed in writing with the clerk within fourteen (14) days after being served with a copy of this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Video Views, Inc. v. Studio 21, Ltd.*, 797 F.2d 538, 539 (7th Cir. 1986).

ENTERED this 16th day of January, 2026.

s/ERIC I. LONG
UNITED STATES MAGISTRATE JUDGE